787 So.2d 1149 (2001)
Roland ROMERO
v.
NORTHROP-GRUMMAN.
No. 01 0024-WCA.
Court of Appeal of Louisiana, Third Circuit.
May 30, 2001.
*1150 Aubrey Edward Denton, Aaron Wayne Guidry, Porter, Denton & Guidry, Lafayette, LA, Counsel for Roland Romero.
Christopher M. Trahan, Raggio, Cappel, etc., Lake Charles, LA, Counsel for Northrop-Grumman.
Court composed of HENRY L. YELVERTON, JOHN D. SAUNDERS, and JIMMIE C. PETERS, Judges.
SAUNDERS, Judge.
Mr. Roland A. Romero has appealed the findings of the workers' compensation *1151 judge in his case. Specifically, Mr. Romero seeks a reversal of the workers' compensation judge's findings regarding his employer's right to a credit and his right to penalties and attorney fees. For the reasons that follow, we reverse.

FACTS
Mr. Roland A. Romero began employment with Northrop Grumman Corporation (Northrop Grumman) in Lake Charles, Louisiana, on November 10, 1997, as an aircraft structure mechanic. Initially, Mr. Romero worked under Mr. John Gott in the outboard wing section of hangar A. Mr. Romero's job duties included cleaning the outboard section of the wing with organic solvents, including alodine, yellow primer, toluene, pro-seal, and methyl ethyl ketone. The outboard tanks were unventilated. Mr. Romero would enter these wing sections with the upper portion of his body in order to clean them. Despite Northrop Grumman's process specifications which precluded an employee without proper certification and personal protective equipment from working in such an environment, Mr. Romero testified that he worked without either.
Mr. Romero testified that while he was working in hangar A, "a monitor come [sic] by and he stopped me and told [me] that I couldn't work because I didn't have no [sic] certifications. I wasn't even supposed to be around the area." Sometime thereafter, Mr. Romero was transferred to a new crew, where he boxed and tagged plane parts after cleaning them with an industrial solvent and a sealer. Mr. Romero's supervisor at that time, Calvin LeDoux, told him that "[he] shouldn't even be out here on the floor [without training]." Mr. LeDoux had Mr. Romero placed into Chennault Training Institution in December 1997. At that time, classes had been in session approximately four weeks. Mr. Romero started during week five and stayed at the Chennault Training Institution for approximately two and one-half weeks. After his training was over, he returned to Mr. LeDoux's crew.
Eventually, Mr. Romero was assigned to another crew called "doors." While working on this crew, he had to prepare plane parts to be shipped to California. This involved using 11-7 and pro-seal to clean and install rivets to hold skins while shipping. Mr. Romero was also responsible for preparing the paperwork for those parts.
On March 26, 1998, Mr. Romero became ill as he was getting out of bed one morning to prepare to go to work. Mr. Romero testified that he felt a sudden onset of dizziness, headache, and nausea, which caused him to fall. That day, he was admitted to Lake Charles Memorial Hospital for treatment. Dr. Anand Roy evaluated him upon admission. Dr. Roy noted that Mr. Romero had no past medical history and that his chief complaints upon admission were dizziness and disorientation. In his report made after examination, Dr. Roy stated that, "[t]he best thing is to get MRI of brain in view of normal neurological sign as soon as possible." Apparently, even after some testing was done, the specific cause of Mr. Romero's dizziness had not been pinpointed. Specifically, Dr. Roy informed Mr. Romero that if he continued to experience problems, he would be subjected to an arteriogram. Dr. Roy discharged Mr. Romero from the hospital on March 28, 1998.
Since then, Mr. Romero has been evaluated by numerous physicians and neuropsychologists in Lake Charles and Houston. Mr. Romero treated with Dr. John W. Largen, a licensed psychologist with a speciality in neuropsychology. Dr. Largen treated Mr. Romero for over a year. Through testing and evaluation, Dr. Largen *1152 found that the level and pattern of neurological tests were commensurate with generalized organic brain impairment of mild to moderate severity. Dr. Largen indicated that the test data were consistent with diffuse and bilateral deficits with no clear lateral features noted. Dr. Largen testified that he felt that Mr. Romero definitely had severe problems, and he felt that they were due to organic brain impairment, not a psychological or psychiatric condition. Although Dr. Largen stated that he deferred to his colleagues as to what had caused the organic brain condition, he opined that Mr. Romero's symptoms and testing indicated neurotoxic exposure. The doctor also indicated that Mr. Romero has concurrent depression and anxiety.
Mr. Romero also treated with Dr. Arch I. "Chip" Carson, an occupational medicine physician and toxicologist, to further investigate the potential connection between Mr. Romero's occupational chemical exposure and his symptoms. Dr. Carson examined Mr. Romero, his history, his medical records, and MSDS's in order to make his diagnosis. Dr. Carson testified he believed Mr. Romero had two principal diagnoses contributing to his symptoms. The first was an organic brain syndrome, which he found to be more likely than not due to toxic chemical damage resulting from his workplace exposure to organic solvents. The second was rather severe mental depression, which contributed to and intensified his symptoms. Dr. Carson based his diagnoses on the fact that other probable causes of Mr. Romero's problems had been ruled out and that the conclusions were consistent with the test results and other medical evaluations as well as his own.
Dr. Timothy B. Boone, a board certified urologist, also examined Mr. Romero. Dr. Boone found that Mr. Romero's urinary dysfunction was consistent with organic brain syndrome secondary to organic solvent exposure. At his deposition, he was asked the following:
Q. But within your field of speciality and within your fields of subspecialty and concluding-and excuse me, and including your neuroscience background, would the presentation of Mr. Romero be consistent with organic brain syndrome secondary to organic solvent exposure?
A. It was consistent with organic brain syndrome. And if neurologic exclusion had come up with that diagnosis, having not ever seen toxic exposure and OBS and in sufficient numbers, then I would be dependent on that diagnosis. But it could well fit.
In addition, to the physicians above, Mr. Romero was also examined by Dr. John R. Mathias and Dr. William J. Nassetta. Dr. Mathias, a neurogastroenterologist, performed fifteen hours of electro-diagnostic tracing of Mr. Romero's upper small intestine. From these studies, Dr. Mathias found that Mr. Romero suffers from enteric nerve disease. Dr. Mathias stated that Mr. Romero suffers from "hollow visceral neuropathy, which is the worst form of enteric neuropathy you can have." After his evaluation, Dr. Mathias concluded that Mr. Romero's exposure to industrial solvents was the most likely cause of his hollow visceral neuropathy. In addition, Dr. Nassetta, an occupational medicine specialist, conducted a records review of Mr. Romero's case. Dr. Nassetta explained that exposure to organic solvents can have both an acute and chronic effect. Dr. Nassetta stated that the symptoms of an acute affect quickly disappear, but the chronic effect of exposure occurs gradually and loss of function occurs after many years. Dr. Nassetta found no specific scientific basis to attribute Mr. Romero's condition to organic solvent exposure.
*1153 Finally, Mr. Zachary Krabill, an industrial hygienist employed by Northrop Grumman, testified at trial. He testified that the air sampling he conducted in the outboard wing sections of the aircraft exposed individuals to organic solvent levels below the maximum exposure limits.

PROCEDURAL FACTS
Mr. Romero filed a claim for disputed compensation on January 5, 1999, seeking indemnity benefits and medical benefits under the Louisiana Workers' Compensation Act. In his claim, he asserted that he was diagnosed with organic brain syndrome on September 9, 1998, and that the cause of that condition was his exposure to "noxious vapor inhalation from chemicals used to clean aircraft parts."
Trial on the merits was held on February 14, 2000, and February 16, 2000. Mr. Romero maintained that his overexposure to toxic substances at Northrop Grumman constituted an accident and/or occupational disease under workers' compensation law, thereby entitling him to workers' compensation indemnity and medical benefits, as well as penalties and attorney's fees for the failure on the part of Northrop Grumman to acknowledge its liability under the act.
The workers' compensation judge (WCJ) signed the judgment on June 7, 2000. The WCJ found by an overwhelming preponderance of the evidence that Mr. Romero's organic brain syndrome was casually related to his workplace exposure to toxic chemicals. In addition, the WCJ held that Mr. Romero was temporarily totally disabled, retroactive to March 26, 1998. Furthermore, the WCJ found that Northrop Grumman was entitled to a credit for "short term disability and health insurance benefits" if it could provide evidence to the court of the proportion funded by the employer. Finally, the WCJ denied Mr. Romero's request for penalties and attorney fees.
On July 5, 2000, Northrop Grumman filed a suspensive appeal regarding the issue of its liability; however, it dismissed the appeal on August 20, 2000. Mr. Romero filed the instant devolutive appeal on July 26, 2000.

LAW AND ANALYSIS

STANDARD OF REVIEW
Our court reviews the factual findings of a workers' compensation court under the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305 (La.2/28/94); 633 So.2d 129. In applying the manifest error-clearly wrong standard, we must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, D.O.T.D., 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Id. Accordingly, if the workers' compensation court's findings are reasonable in light of the record reviewed in its entirety, we may not reverse, even if convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).

ASSIGNMENTS OF ERROR
On appeal Mr. Romero makes the following assignments of error:
1. The WCJ erred in finding that Northrop Grumman is entitled to a credit pursuant to La.R.S. 23:1225 because such credit is not supported by the evidence contained in the record.
2. The WCJ erred in finding that Northrop Grumman reasonably controverted *1154 the claim for indemnity and medical benefits.

CREDIT PURSUANT TO LA.R.S. 23:1225
In his first assignment of error, Mr. Romero asserts the WCJ erred in finding that Northrop Grumman is entitled to a credit pursuant to La.R.S. 23:1225 because such a credit is not supported by the evidence contained in the record. Mr. Romero notes that Northrop Grumman filed a supplemental answer on January 31, 2000, alleging entitlement to a credit for "short term disability benefits and health insurance benefits pursuant to an employee benefit plan provided by Northrop Grumman for its employees." During trial of the matter, however, Mr. Romero asserts that Northrop Grumman presented no evidence to support such a credit. In particular, he notes that the record is completely devoid of any evidence establishing the proportion of funding, if any, by Northrop Grumman to an employee benefit plan. Accordingly, he argues that the WCJ's decision which entitles Northrop Grumman to a statutory credit is contrary to the evidence present on the record.
In its judgment, the WCJ stated:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that NORTHROP GRUMMAN CORPORATION is entitled to a credit for "short term disability benefits and health insurance benefits pursuant to an employee benefit plan providing by NORTHROP GRUMMAN CORPORATION" only after provided evidence to the court of the proportion funded by the employer, if any, to an employee benefit plan.
In addition, the WCJ's reasons for judgment reflect that in order for Northrop Grumman to actually be entitled to a credit it must provide evidence to the court of the proportion funded by the employer to an employee benefit plan.
In opposition to Mr. Romero's assignment, Northrop Grumman argues that the WCJ has discretion pursuant to La.Code Civ.P. arts. 1631 and 1632 to leave the record open for the taking of additional evidence, or to reopen the record if justice so requires. Northrop Grumman argues that since the primary issue at trial was compensability, the WCJ was correct in holding open the record to allow evidence as to the amount of set off to which Northrop Grumman would be entitled to because of benefits paid through its medical plan and disability programs.
We disagree. We begin our analysis by noting that nothing in the trial record indicates that Northrop Grumman ever requested that the record remain open for further evidence. At the end of trial, when the WCJ asked if there were "any other issues to come before [the court]," counsel for Northrop Grumman responded in the negative. The record was left open for post trial briefs only.
The WCJ rendered judgment on all issues in the case, and it is apparent on the face of the judgment that the WCJ did not receive enough evidence during the course of the hearing to determine what, if any, credit Northrop Grumman would be entitled to for its provision of medical benefits and disability benefits to Mr. Romero. Instead of leaving the record open for an indefinite time as was done here, the WCJ should have denied Northrop Grumman's demand for credit. Northrop Grumman brought the issue forward in its Supplemental Answer, yet failed to provide the proof necessary at the hearing to allow the WCJ to award a setoff. Northrop Grumman bore the burden of proving its right to a credit. La.R.S. 23:1225(C)(1); City of Natchitoches v. Williams, 94-1411 (La. App. 3 Cir. 5/24/95); 657 So.2d 320. We *1155 recognize the WCJ's discretion in allowing the record to remain open for further evidence. See Tatum v. Old Republic Ins. Co., 94-157 (La.App. 3 Cir. 10/5/94); 643 So.2d 419, writ denied, 94-2722 (La.1/6/95); 648 So.2d 929; See Brown v. Hobson, 30,131 (La.App. 2 Cir. 1/21/98); 706 So.2d 1030, writ denied, 98-0479 (La.4/3/98); 717 So.2d 1132 (illustration of trial court's discretion in allowing the reopening of the evidentiary record); Antley v. Brantly, 28,049 (La.App. 2 Cir. 2/28/96); 669 So.2d 685 (same). However, in a case such as this, where the defendant has been given full opportunity to present evidence at a hearing, has presented no acceptable reason for its failure to present evidence, has given no compelling reason for the record to remain open, and has not specifically requested that the record remain open, no further opportunity for the presentation of evidence should be given. Accordingly, we find that the WCJ erred in rendering a judgment allowing Northrop Grumman a credit for the provision of medical and disability benefits because Northrop Grumman did not provide adequate evidence of its entitlement to such benefits at the hearing on the matter.

REASONABLY CONTROVERTED
In his second assignment of error, Mr. Romero urges that the WCJ erred in finding that Northrop Grumman reasonably controverted his claim for indemnity and medical benefits such that he was not entitled to penalties and attorney fees.
Mr. Romero seeks to recover penalties and attorney fees under La.R.S. 23:1201, which provides in pertinent part:
B. The first installment of compensation payable for temporary total disability, permanent total disability, or death shall become due on the fourteenth day after the employer or insurer has knowledge of the injury or death, on which date all such compensation then due shall be paid.
. . . .
E. Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof.
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
The determination of whether an employer should be cast with penalties and attorney fees is essentially a question of fact; we will not reverse the WCJ's finding on appeal absent evidence of manifest error. Wiltz v. Baudin's Sausage Kitchen, 99-930 (La.App. 3 Cir. 6/19/00); 763 So.2d 111, writ denied, 00-2172 (La.10/13/00); 771 So.2d 650. Penalties and attorney fees are *1156 available to a claimant when his employer does not provide workers' compensation benefits as required by law. See Clifton v. Rapides Reg'l Med. Ctr., 96-509 (La.App. 3 Cir. 10/9/96); 689 So.2d 471.
Mr. Romero asserts that Northrop Grumman failed to provide his indemnity and medical benefits timely. To avoid the imposition of penalties and attorney fees for the nonpayment of benefits, the employer has a continuing obligation to investigate, to assemble, and to assess factual information before denying benefits. See Parfait v. Gulf Island Fabrication, Inc., 97-2104 (La.App. 1 Cir. 1/6/99); 733 So.2d 11. The determination of whether an employer has reasonably controverted claims for the purpose of imposing penalties and attorney fees depends on the facts known to the employer at the time of its conduct. Harris v. Langston Co., 94-1266 (La.App. 3 Cir. 4/5/95); 653 So.2d 789, writ denied, 95-1178 (La.6/23/95); 656 So.2d 1020. To reasonably controvert a claim so as not to be liable for statutory penalties, the employer must have factual or medical information of such a nature that it reasonably counters that provided by the workers' compensation claimant. Balsamo v. Jones, 28-885 (La.App. 2 Cir. 12/11/96); 685 So.2d 1140.
Mr. Romero argues that Northrop Grumman "had absolutely no information to reasonably controvert his claim, especially in light of the medical evidence that was provided, which clearly linked his condition to his on-the-job exposure to toxic substances." Particularly, Mr. Romero points to a letter to Northrop Grumman's counsel, dated April 6, 1999. This letter provided various medical reports to Northrop Grumman's counsel, advising Northrop Grumman of Mr. Romero's condition. In addition, Mr. Romero points to a letter from his counsel to Northrop Grumman's counsel, dated June 22, 1999. This letter advised Northrop Grumman that a collection letter had been received from the Diagnostic Clinic of Houston.
On June 24, 1999, when Northrop Grumman's counsel responded to Mr. Romero's counsel's letter of June 22, 1999, it provided no evidence that the claim was reasonably controverted. The letter stated:
It is our contention that Mr. Romero's problems, whatever they might be, were not caused by his employment at Northrop Grumman Corporation. For that reason, we must decline payment of the submitted medical expenses.
In addition, in response to Mr. Romero's request for production of documents on July 20, 1999, Northrop Grumman stated:
Employer responds that it does not know the cause of any or all of employee's symptoms or claimed medical problems. The burden of proof is on the employee to show at trial that he has suffered an injury or occupational disease arising out of and in the course of his employment by employer, and employer submits that employee will be unable to carry that burden.
Finally, Mr. Romero notes that Northrop Grumman did not request that claimant be seen by a physician of its choosing, Dr. Robert D. Davis, a neuropsychologist in Baton Rouge, until October 26, 1999. Therefore, Mr. Romero argues that Northrop Grumman did not reasonably controvert his claim.
In addition to Northrop Grumman's utter lack of explanation as to what facts or medical evaluations it relied on in making its determination to deny benefits, the court is impressed with the amount of evidence provided that clearly indicated that Mr. Romero was entitled to such benefits. Mr. Romero clearly met the heightened burden of proof necessary to prove that his organic brain syndrome was *1157 caused by his work place environment. The high level of evidence supporting the connectivity of his disease with his work was summarized by the WCJ in her reasons for judgment. The WCJ found that Mr. Romero had proven his case by an overwhelming preponderance of the evidence, the standard under La.R.S. 23:1031.1. The WCJ found that the testimony at trial established that Mr. Romero was exposed to organic solvents during the course and scope of his employment with Northrop Grumman. In addition, the WCJ indicated that the testimony of Mr. Romero's treating physicians showed that Mr. Romero's condition was a result of workplace organic solvent exposure. Specifically, she noted the testimony of Dr. Mathias, Dr. Carson, Dr. Largen, and Dr. Boone. Dr. Mathias opined that Mr. Romero's exposure to industrial solvents was the most likely cause of Mr. Romero's neuropathy. Dr. Carson, relying on the history he had been given, diagnosed Mr. Romero as suffering from organic brain syndrome, more likely than not due to toxic chemical damage resulting from workplace exposure. Dr. Largen examined Mr. Romero on May 28, 1998 and December 17, 1998. Dr. Largen indicated Mr. Romero's pattern of impairment is consistent with organic solvent exposure. Dr. Boone found that Mr. Romero's urinary dysfunction was consistent with organic brain syndrome secondary to organic solvent exposure.
A review of the record shows that Northrop Grumman did not make reasonable efforts to ascertain Mr. Romero's exact medical and physical condition before it denied benefits. Mr. Romero had provided Northrop Grumman with medical evidence to show that his condition was causally related to his workplace exposure to various toxic substances. Despite that fact, Northrop Grumman simply denied benefits, not showing any factual or medical information on its part that would reasonably controvert Mr. Romero's claim. The evidence in this case provided by Mr. Romero to show that the organic brain syndrome was work related was so strong that Mr. Romero proved his case by an overwhelming preponderance of the evidence. Absent a significant showing of factual or medical evidence upon the denial of workers' compensation benefits, and in light of such overwhelming evidence of occupational injury, we find that Northrop Grumman did not reasonably controvert Mr. Romero's claim. Accordingly, we find that the WCJ erred in failing to provide penalties and attorney fees to Mr. Romero.
While the legislature has set statutory limits on the amount of penalties which may be awarded, the legislature has made no such limitation on the amount of attorney fees which may be awarded. See La.R.S. 23:1201. The legislature's only mandate is that such attorney fees be reasonable. In setting reasonable attorney fees, the supreme court has advised us to consider "the degree of skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the amount of time devoted to the case." Naquin v. Uniroyal, Inc., 405 So.2d 525, 528 (La.1981). In the instant case, it is apparent that Mr. Romero's attorneys have exercised a great amount of skill and have taken great pains in the preparation of this case both at trial and on appeal. Mr. Romero's attorneys have succeeded in obtaining workers compensation benefits for Mr. Romero, proving his entitlement by an overwhelming preponderance of the evidence. Their success came only after the mastery of a rather difficult case, involving difficult scientific concepts, the review of voluminous medical records, and the taking of numerous medical depositions. Additional evidence as to the effort of the *1158 attorneys is found in the voluminous and rather exhaustive nature of the record. Finally, their legal work, including their brief on appeal, is of the best quality. Therefore, we award Mr. Romero $2,000.00 in penalties and $7,500.00 in attorney fees against Northrop Grumman for its failure to provide indemnity benefits.
Employers may be penalized not only for failing to timely pay weekly indemnity benefits, but also for failing to timely deliver competent medical attention. Foster v. Liberty Rice Mill, 96-438 (La. App. 3 Cir. 12/11/96); 690 So.2d 792; Savoy v. McDermott, Inc., 520 So.2d 888 (La.App. 3 Cir.1987). The test for determining whether an employer has fulfilled its duty to furnish medical benefits is whether the employer or insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the workers' compensation claimant. Gibson v. Dynamic Indus., Inc., 96-1605 (La.App. 3 Cir. 4/2/97); 692 So.2d 1320; Faul v. Bonin, 95-1236 (La.App. 3 Cir. 8/7/96); 678 So.2d 627, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769. As already addressed regarding its failure to pay indemnity benefits, Northrop Grumman did not reasonably controvert Mr. Romero's claim for workers' compensation benefits. A workers' compensation claimant may be awarded a penalty for his employer's failure to timely pay wage benefits and an additional penalty for his employer's failure to pay medical benefits. See Batiste v. Capitol Home Health, 96-799 (La.App. 3 Cir. 5/7/97); 699 So.2d 395. Accordingly, we find that the WCJ erred in failing to award penalties and attorneys fees for Northrop Grumman's failure to pay Mr. Romero's medical expenses. Therefore, we find that Mr. Romero is entitled to an additional award of $2,000.00 in penalties and an additional $7,500.00 in attorney fees. We also award $2,500.00 in attorney fees for the work done on appeal. This award of attorney fees is merited for the reasons we stated with reference to the award of attorney fees with regards to Northrop Grumman's denial of indemnity benefits.

DECREE
Based on the foregoing discussion, we reverse the WCJ's decision. We reverse the WCJ's determination that Northrop Grumman is entitled to a credit for benefits it provided because it failed to provide sufficient proof of such benefits at trial. We also reverse the WCJ's determination that Northrop Grumman reasonably controverted Mr. Romero's claim for indemnity and medical benefits. Accordingly, we award $2,000.00 in penalties and $7,500.00 in attorney fees for its denial of indemnity benefits. Additionally, we award another $2,000.00 in penalties and $7,500.00 in attorney fees for its denial of medical benefits. We also award $2,500.00 in attorney fees for the work done on appeal. All costs of appeal are assessed against Northrop Grumman.
REVERSED AND RENDERED.