# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## 07-990


KELLY NASH

VERSUS

AECOM TECHNOLOGY CORPORATION


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 02
PARISH OF RAPIDES, NO. 06-06852
HONORABLE JAMES L. BRADDOCK, PRESIDING
\*\*\*\*\*\*\*\*\*\*


## SYLVIA R. COOKS
## JUDGE


\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and
Jimmie C. Peters, Judges.


**AFFIRMED AS AMENDED.**


Scott Webre
556 Jefferson Street, Suite 500
Lafayette, LA 70501
(337) 593-4178
COUNSEL FOR PLAINTIFF/APPELLEE:
    Kelly Nash

James J. Hautot
Judice & Adley
926 Coolidge Blvd.
Lafayette, LA 70505
(337) 235-2405
COUNSEL FOR DEFENDANTS-APPELLANTS:
    Aecom Technology Corporation and Insurance Company
    of the State of Pennsylvania

**COOKS, Judge.**

In this workers' compensation case, the employer, Aecom Technology Corporation, and its insurer, Insurance Company of the State of Pennsylvania, appeal the judgment of the Office of Workers' Compensation finding they were arbitrary and capricious in failing to authorize a necessary surgical procedure and assessing penalties and attorney fees for that failure. For the following reasons, we affirm as amended.

## FACTS AND PROCEDURAL HISTORY

Claimant, Kelly Nash, fell at work on March 7, 2005. Mr. Nash promptly reported the accident to his supervisor and filled out an accident report that same day. He complained of pain in his lower left side hip and back to the degree he could barely walk within an hour of the accident. That same day, Mr. Nash sought treatment from the employer's physician, Dr. Hanna Lubbos. He was assessed with "low back pain, secondary to fall." A lumbar MRI was ordered which revealed "mild narrowing at L5-S1" and "severe findings . . . on the Left at L2-3." Dr. Lubbos referred Mr. Nash to a neurosurgeon.

Mr. Nash began treatment with neurosurgeon, Dr. Alan Appley, which did not provide much benefit. On February 20, 2006, a follow-up MRI, with and without axial loading, was performed. It revealed a herniated disc at L5-S1, for which Dr. Appley recommended microdiscectomy surgery. A recommendation and request for surgery was received by the insurer on June 9, 2006. A second opinion was obtained by the insurer's choice of neurosurgeon, Dr. Ricardo Leoni. Dr. Leoni's report, dated July 25, 2006, concluded Mr. Nash had "radicular pain that goes all the way down into the bottom of his foot and one would have to say that this is probably from L5-

S1. I think that he would probably do best with a microdiscectomy."

On August 11, 2006, the insurer's case manager, Debbie Kershaw, inquired to Dr. Leoni as to whether "the L5-S1 problem occurred after the MRI from 4/8/05." On August 15, 2006, Dr. Leoni replied that the "L5-S1 disc bulge occurred after the 4-8-05 MRI scan." Ms. Kershaw then asked Dr. Appley if he agreed with Dr. Leoni's opinion that the disc bulge occurred after the MRI. Ms. Kershaw received a note from Dr. Appley on August 21, 2006, stating that he agreed with Dr. Leoni's above conclusion. Ms. Kershaw then asked Dr. Appley if he believed the L5-S1 bulge was related to the work accident.

On December 7, 2006, Dr. Leoni stated in correspondence to Ms. Kershaw that "I don't think I could make a case that [claimant's] accident caused this herniated disc at L5-S1." On March 16, 2007, Dr. Appley stated he believed the herniated disc was more likely than not caused by the work accident. He wrote:

> The MRI of 4/8/05 is not normal at L5-S1. There is diffuse bulging and a central HIZ (high intensity zone) consistent with an annular tear. This was, more likely than not, secondary to the 3/7/05 work injury.

Despite Dr. Appley's conclusion, the insurer's adjuster did not approve the recommended surgery, basing its decision on Dr. Leoni's report.

Mr. Nash filed a claim with the Office of Worker's Compensation alleging an "arbitrary and capricious denial of surgical treatment recommended by treating physician warranting penalties and attorney fees." Mr. Nash has received regular indemnity benefits since the accident, thus, there are no issues relating to indemnity. The employer/insurer requested the appointment of an independent medical examiner (IME) to evaluate what the MRI of April 8, 2005 showed. The Workers' Compensation Judge (WCJ) denied this request, finding, under La.R.S. 23:1123, an

IME is inappropriate where the condition of the employee is not in question, but only the causation of the employee's condition. The WCJ noted the dispute was not whether claimant had a herniated disc, but whether the herniated disc occurred because of the work accident.

Approximately one week before trial on the matter, the employer/insurer authorized the surgery. Thus, the only issue at trial was whether Defendants were unreasonable in withholding authorization for surgery pending an investigation as to whether the proposed surgery was related to the work accident.

After trial on the matter, the workers' compensation judge (WCJ) found the employer/insurer utilized "a lot of speculation and conjecture" in the denial of the recommended medical care and thus, "unreasonably, arbitrarily and capriciously denied and delayed reasonable and necessary medical treatment recommended" by Dr. Appley. The trial court awarded a penalties of $2,000.00 and attorney fees in the amount of $3,500.00. The employer/insurer appealed. Mr. Nash answered the appeal seeking additional attorney fees for the work necessitated by the appeal.

## ANALYSIS

This court in *Noel v. Home Health 2000, Inc.*, 01-1543 (La.App. 3 Cir. 5/8/02), 816 So.2d 955, 956-57, set forth the applicable law governing the refusal to authorize recommended medical treatment:

> The law governing the furnishing of medical care, and the consequences of the refusal to authorize such care, is found in Louisiana Revised Statutes 23:1203 and 23:1201. 23:1203(A) states in pertinent part:
>
> > In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal,

public, or private facilities as will provide the injured employee with such necessary services.

Louisiana Revised Statute 23:1201(E) provides that: "[m]edical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." Subsection (F) states that failure to comply with this section "shall result in the assessment of a penalty ... together with reasonable attorney fees for each disputed claim."

The decision to impose penalties is a factual question, which will not be disturbed on appeal in the absence of manifest error. *Spencer v. Gaylord Container Corp.*, 96-1230 (La.App. 1 Cir. 3/27/97), 693 So.2d 818. Louisiana courts have consistently held that failure to authorize a medical procedure for an employee eligible to receive workers' compensation is deemed to be a failure to furnish compensation benefits, thereby triggering the penalty provisions of the Louisiana Workers' Compensation Act. *Gay v. Georgia Pacific Corp.*, 32,653 (La.App. 2 Cir. 12/22/99), 754 So.2d 1101. Penalties and attorney fees for failure to timely pay benefits will be assessed against an employer or insurer unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control. La.R.S. 23:1201; *Brown v. Texas-LA Cartage, Inc.*, 98-1063 (La.12/1/98), 721 So.2d 885. The supreme court in *Brown* went on to state that:

> in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.

*Brown*, 721 So.2d at 890.

In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. *Stobart v. State Through DOTD*, 617 So.2d 880 (La.1993); *Mart v. Hill*, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be

manifestly erroneous or clearly wrong. *Stobart*, 617 So.2d 880. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990).

The WCJ specifically noted that appellants' suggestions of sneezing, coughing and hunting activities as possible reasons for denial of the recommended surgery were pure speculation and conjecture. Further, the WCJ stated that appellants did not ask the appropriate question of Dr. Leoni nor Dr. Appley regarding whether or not the herniated disc at L5-S1 was causally related to the work accident. This was corroborated by the testimony of appellants' adjuster on claimant's file, Brian Lindsey, who testified as follows:

> Q.   Did you make any inquiry of any person specifically as to whether or not an MRI one month following an accident and injury can show, basically, normal findings only to develop later into a herniation, the herniation stemming from an injury occurring prior to the MRI? Do you have any appreciation for whether or not that's possible?
>
> A.   It's my understanding that that's how it can occur, but we have to go with what the doctors are saying which is not what he said.
>
> Q.   But you didn't ask that of Dr. Appley in this letter, did you?
>
> A.   I asked if he thought it occurred after 04/08 of 05? That's what I asked him.
>
> Q.   *You asked if the L5, S1 problem occurred after the MRI from 04/05, but you didn't specifically address whether or not it could have been a latent injury stemming from the March 7, 2005 accident only to surface later or present itself later on the second MRI.*
>
> A.   *Well, we didn't -- we weren't aware that that was what essentially was going on until we got the letter in March from Dr. Appley.*

(Emphasis added.)

The WCJ also noted that the first MRI was not done with axial loading, whereas the

second MRI was performed with axial loading. Mr. Lindsey explained that axial loading in an MRI means weight is applied to the back to compress the discs and that "something really small might not show up on a normal one." Mr. Lindsey acknowledged that he became aware that only the second MRI was done with axial loading. Despite his awareness that the first MRI was substantially different in its ability to measure a problem than the second MRI, that detail was not discussed with Dr. Leoni at any time.

Mr. Lindsey's testimony, as set forth below, clearly indicates a lack of urgency on appellants' part to fully investigate Dr. Appley's conclusions that the disc herniation was more likely than not caused by the work accident:

> Q. So in March of '07 when you learned what was going on, that there were these high intensity zones on the original MRI, you then formed an opinion that the L5, S1 problem did stem from the March 7, '05 accident, correct?
>
> A. Well, I had formed the opinion that that was what Dr. Appley was saying. Like I said, I'm not - - I mean, as we said earlier, I'm not a doctor or a neurosurgeon, so I kind of have to go with what they're saying.
>
> Q. Okay, and you had - - and you had - - since that time, had not formed - - not been provided any information to develop an opinion that Dr. Appley was wrong?
>
> A. No, I have not.
>
> Q. And you did not contact Dr. Leoni subsequent to the March '07 report of Dr. Appley to check his opinion against Dr. Appley's?
>
> A. Well, we were going to ask for an IME with the State to come on in.
>
> Q. I understand that, but that's not my question. My question is, you never went back to Dr. Leoni to inquire whether or not what Dr. Appley said about these high intensity zones was correct, right?
>
> A. No. At that point, we had his opinion three times. It didn't seem

that relevant.

Q.    So the answer to my question is, "No," you didn't - -

A.    No, I did not.

Q.    When was the first time you made an effort to go to back to Dr. Leoni and find out?

A.    Early - - in May 2nd, I believe, within a week or two of the trial where our IME was denied.

Q.    Why didn't you go to him immediately in March after receipt of Dr. Appley's report?

A.    Well, we had already had his opinion three times that he disagreed with what Appley was saying, and so we felt that getting a third opinion was really the best way to go.

Q.    You didn't have an opinion from Dr. Leoni as to the high intensity zones referenced by Dr. Appley from the '05 MRI, right?

A.    No.

Q.    So that's something new that could have been addressed with Dr. Leoni as soon as you got Dr. Appley's report, right?

A.    If he would have been available to comment, yes.

Q.    Well, was he unavailable to comment?

A.    As of May 2nd, he was, when we sent our response - - our request for that exact information.

Q.    Do you know whether he was available in the month of April?

A.    No, I don't.

Q.    Do you know whether he was available in the end of March after receiving Dr. Appley's report?

A.    No, I don't.

Taking the record as a whole, appellants' refusal to authorize the recommendation for surgery by Dr. Appley was not reasonably controverted by competent medical

evidence. The WCJ was not manifestly erroneous in its imposition of penalties and attorney fees.

We also note La.R.S. 23:1201(E) provides that "[m]edical benefits payable under this Chapter shall be paid *within sixty days* after the employer or insurer receives written notice thereof." (Emphasis added.) Violation of this section "*shall result in the assessment of a penalty*" as well as "reasonable attorney fees." La.R.S. 23:1201(F). Although the WCJ did not base his decision on the failure to pay benefits within the sixty day period, we find appellants were in violation of this provision. The recommendation and request for surgery was received by the insurer on June 9, 2006. By the expiration of the sixty day period, August 8, 2006, appellants possessed the recommendation for surgery by Dr. Appley, the second opinion of its choice of physician, Dr. Leoni, agreeing with Dr. Appley's recommendation for surgery, and the utilization review performed by Health Direct, Inc., acknowledging the surgery had been "recommended as medically necessary." It was not until August 11, 2006, after the expiration of the sixty day period, when the insurer's case manager, Debbie Kershaw, first approached Dr. Leoni and inquired as to whether "the L5-S1 problem occurred after the MRI from 4/8/05." Appellants neither reasonably controverted the recommendation for surgery within sixty days, nor demonstrated its failure to do so was beyond its control. Thus, penalties and attorney fees are appropriate under R.S. 23:1201(F).

Claimant answered the appeal, and requests an additional award of attorney fees for work performed on this appeal. A workers' compensation claimant is entitled to an increase in attorney fees to reflect additional time incurred in defending an employer/insurer's unsuccessful appeal. *Hickman v. Allstate Timber Co.*, 94-1275

(La.App. 3 Cir. 4/5/95), 653 So.2d 154, *writ denied*, 95-1133 (La. 6/23/95), 656 So.2d 1017.  Accordingly, we award an additional $2,000.00 in attorney fees for the successful handling of this appeal.

## DECREE

For the above reasons, the judgment is amended to award an additional $2,000.00 in attorney fees for the appeal and is otherwise affirmed.  Costs of this appeal are assessed to the appellants, Aecom Technology Corporation and Insurance Company of the State of Pennsylvania.

**AFFIRMED AS AMENDED.**