# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-1041

CHRISTOPHER GREEN

VERSUS

NATIONAL OILWELL VARCO

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4
PARISH OF LAFAYETTE, NO. 09-01933
SAM LOWERY, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AMENDED IN PART AND AFFIRMED.
ADDITIONAL ATTORNEY FEES AWARDED TO APPELLEE.**

Thomas J. DeJean
DeJean & Leger
806 South Main Street
Opelousas, Louisiana 70570
(337) 948-9066
Counsel for Plaintiff/Appellee:
    Christopher Green

Charles A. Mouton
J. Keith Gates
Mahtook & LaFleur, L.L.C.
Post Office Box 3605
Lafayette, Louisiana 70502
(337) 266-2189
Counsel for Defendant/Appellant:
    National Oilwell Varco

**KEATY, Judge.**

The defendant, National Oilwell Varco (Varco), appeals a judgment rendered by the workers' compensation judge (WCJ) in favor of its former employee, Christopher Green (Green), finding that he was injured in a work-related accident and awarding him workers' compensation benefits, along with penalties and attorney fees. Green answers the appeal seeking additional attorney fees for work done on appeal and an order that Varco be cast with legal interest and all costs incurred in the trial and appellate court. For the following reasons, we amend in part, affirm, and award Green additional attorney fees on appeal.

## FACTS AND PROCEDURAL HISTORY

On March 3, 2009, Green filed a 1008 Disputed Claim for Compensation (1008) against Varco, seeking benefits and medical treatment pursuant to the Louisiana Workers' Compensation Act (LWCA), La.R.S. 23:1021-1415, for injuries that he sustained in a workplace accident on January 27, 2009. He alleged that he suffered an injury to his groin area as he and his helper were breaking down a mud motor and pressure in the motor released, pushing an impact wrench into his groin. Green further sought an award of statutory penalties and attorney fees, characterizing Varco's actions as arbitrary and capricious and alleging that Varco had failed to reasonably controvert his claim. In its answer to Green's 1008, Varco asserted that its denial of benefits was reasonable and proper, and it disputed Green's allegation that its actions were arbitrary, capricious, or unreasonable.

The matter was originally set for trial on November 16, 2009; however, several continuances were granted and the matter was eventually tried on May 5, 2010. At

the close of trial, the WCJ orally ruled in favor of Green and ordered Green's counsel of record to prepare a written judgment in conformity with his oral ruling.

The WCJ signed a written judgment on May 28, 2010, against Varco and in favor of Green that provided as follows: (1) Green was awarded all back due temporary total disability benefits (TTDs) at a rate of $348.40 per week commencing on January 27, 2009 through the date of judgment and continuing; (2) Varco was ordered to pay all work-related medical expenses incurred by Green pursuant to the LWCA reimbursement schedule; (3) Varco was ordered to authorize the treatment of Green for his work-related injury by his choice of physician; (4) Varco was ordered to pay Green a penalty of $2,000.00 for failing to pay indemnity benefits; (5) Varco was ordered to pay Green a penalty of $2,000.00 for failing to pay and authorize medical benefits; and (6) Varco was ordered to pay Green attorney fees of $12,500.00. All of the amounts found to be owed by Varco were ordered to be paid with legal interest. In addition, Varco was cast with all costs.

Varco is now before this court asserting that the trial court erred in: (1) awarding past and future medical care; (2) awarding indemnity benefits; (3) miscalculating the amount of indemnity benefits owed; (4) awarding penalties and attorney fees for the failure to provide medical care; and (5) awarding penalties and attorney fees for the failure to pay indemnity benefits.[1]

**DISCUSSION**

*Personal Injury by Accident*

A worker bringing a compensation action against his employer bears the burden of proving, as a threshold requirement, that he suffered "personal injury by

---

[1]Varco does not challenge the amounts of penalties and attorney fees awarded to Green by the WCJ.

2

accident arising out of and in the course of his employment." La.R.S. 23:1031(A); *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357 (La.1992). The word "accident" as used in La.R.S. 23:1031 is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1).

This court discussed the standard of review to be employed in workers' compensation cases in *Foster v. Rabalais Masonry, Inc.*, 01-1394, pp. 2-3 (La.App. 3 Cir. 3/6/02), 811 So.2d 1160, 1162, *writ denied,* 02-1164 (La. 6/14/02), 818 So.2d 784:

> Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Smith v. Louisiana Dep't of Corrections,* 93-1305 (La. 2/28/94); 633 So.2d 129. In applying the manifest error standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State,* 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. *Id.* Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.,* 558 So.2d 1106, 1112 (La.1990).

"The determination of coverage is a subjective one in that each case must be decided from all of its particular facts." *Jackson v. Am. Ins. Co.*, 404 So.2d 218, 220 (La.1981). This court has held that, in light of that standard of review, "great deference is accorded to the [workers' compensation judge's] factual findings and reasonable evaluations of credibility." *Cent. Lumber Co. v. Duhon*, 03-620, p. 3 (La.App. 3 Cir. 11/12/03), 860 So.2d 591, 593, *writ denied*, 04-315 (La. 4/2/04), 869

3

So.2d 880 (quoting *Garner v. Sheats & Frazier*, 95-39, p. 7 (La.App. 3 Cir. 7/5/95), 663 So.2d 57, 61).

Green testified that he was thirty-nine years old and had completed the twelfth grade. He had been an employee of Varco for approximately three months when the accident occurred.[2] Green was the lead service technician over his crew of four. His job was to tear down and service mud motors used in the oilfield industry; that involved pulling and tugging parts weighing between forty to fifty pounds.

On the afternoon of Tuesday, January 27, 2009, he and Michael Shane Beard had just begun breaking down a motor. As he "went to back off the rotor catch," it pressured up, struck him in the groin, and he flew backwards, landing on his back. He had never seen a tool pressure up like that before. He immediately felt pain all the way down his leg, and he urinated on himself. Beard and Thaddeus Lee, another co-worker, helped him get off the floor and to the bathroom. He told everyone that he was in pain and unable to continue working. Varco's "safety guy," Irv Arceneaux had left for the day, but he came back and transported Green to the MedXcel walk-in clinic.

Green drove himself home that evening and soaked in the bathtub. He was unable to get out of bed the next day, and when Arceneaux called to check on him, Green expressed that he was in "so much pain." Green missed work Thursday. He went to work on Friday, but his groin started to swell. He told his supervisor, "Little John," and Kerry Bertrand, Varco's Facility Manager, that he could not work. He also told Bertrand that he was going back to the doctor because he was having pain

---

[2]Green testified that he had previously been employed with Varco for a three-year period, but he had gone to work for another company for four years before being rehired by Varco.

down his leg and "using the bathroom on myself." On cross-examination, he denied telling Bertrand that he was seeing his doctor to be able "to perform better in bed."

Green was examined by Nurse Practitioner Leon Gallow with the Metoyer Family Clinic on Friday, January 30, 2009. While waiting to be seen, he received a call from Tammy Forrest, a registered nurse and employee of Varco whose duty was to medically manage the workers' compensation claims filed against Varco. Green told her that he was seeking treatment from Dr. Metoyer's office for his work injury. He was in extreme pain at the time, however, and told Forrest that he would get back to her with the correct spelling of his doctor's name and his office phone number. Green stated that he may have been rude to Forrest due to the pain he was experiencing. On cross-examination, Green stated that he never provided Forrest with his doctor's phone number.

Green and his wife brought work release slips signed by Dr. Metoyer on January 30 and February 2-3, 2009, to John Aubrey at Varco to give to Bertrand. Sometime afterward, Green received a call from Bertrand telling him that "higher up" had decided to terminate him. At the time, Green had not been worried about losing his job because he had been injured at work while performing his duties. He contacted an attorney after he was fired.

Green continued treating with Dr. Metoyer until he could no longer afford to do so. At that time, Green believed that Dr. Metoyer had taken him completely off work until further notice. Thereafter, he sought treatment at United Medical Center (UMC), a member of the Louisiana charity hospital system. According to Green, Varco never paid any of Dr. Metoyer's bills, nor did it give him authorization to see

5

his own physician for his injuries. Green could not recall ever speaking with or receiving a letter from Billy Holman, the insurance adjuster, after his injury.

Green went to UMC about four times, with his last visit occurring approximately two months before trial. During a November 27, 2009 visit to UMC, Dr. Thad Bourque found blood in his urine. He is still under the care of his UMC doctor, which he interprets to mean that he cannot work because he never continued to work while he was under the care of a doctor in the past.

He also saw two family medicine physicians, Dr. John Tassin and Dr. Calvin White, at his wife's expense. At trial, Green stated that he was still experiencing pain in his testicles, his groin, and down his left leg, and that his pain worsens with activity. He began having back pain one year after the accident and still suffers with it on occasion. Green explained that if he strains or lifts anything weighing forty to fifty pounds, like he often did at Varco, he wets himself and passes blood. He no longer has sex because of his pain and his inability to produce an erection. He stated that he is unable to take Viagra because of his high blood pressure. At the time of trial, Green's was taking Lortab for pain, along with medications for his high blood pressure and for depression.

Green's wife, Angela, testified that on the night of Green's accident, his groin was swollen and she had to help him get out of bed. She stated that Green tried to work Friday after the accident, but he was unable to stay and has not worked since. Angela was present when Green spoke with Forrest on the phone outside of the doctor's office. She never heard Green say anything about not wanting to receive workers' compensation for his injury or that he was only there for Viagra or to get better in bed. She heard him describe to Dr. Metoyer the mechanics of being hit with

6

a pipe and having pain in his left testicle and problems with dribbling urine. Angela described her husband as a proud man who did not like to talk about his injury.

Angela stated that Green was not seeing a doctor for any ongoing problem before he was injured at Varco. She described Green as a good worker who also helped to maintain their house and yard before being injured. In her opinion, Green's injuries have gotten worse with time. His back and legs hurt, and he has difficulty getting out of bed. Green also suffers with scrotal and testicular pain.

Michael Beard, a co-worker who was helping Green break down the mud motor, witnessed the accident. Beard testified that when the motor released pressure, Green was hit in the groin with a two-foot long, solid-metal tool and thrown approximately ten feet and into a wall. According to Beard, Green immediately stated that he "hurt real bad," and Beard noticed that Green had urinated on himself.

Kerry Bertrand, Varco's Facility Manager, testified that he performed an investigation and that he believed that an accident involving Green did occur. He brought Green to the MedXcel clinic where, after being examined, Green was told to ice his groin for twenty-four hours and that he was released to "regular duties as tolerated." Bertrand stated that Varco gave Green the next two days off, and he returned to work on Friday. Green left at noon, explaining to Bertrand that he was going to the doctor because "he was a man and he wanted to perform in bed." According to Bertrand, Green specifically denied that he was seeking treatment for his work injury at that time. Green did not appear to be in any pain that day.

After Green did not show up at work or call in the next Monday, Tuesday, or Wednesday, he was fired. Bertrand stated that Varco had a policy that if an employee did not "show" for three days, he was terminated. Bertrand was not privy to any

7

correspondence between Forrest and Holman. Although Bertrand characterized Green as not being a reliable worker, he admitted that Green worked for Varco for "two tours of duty."

Tammy Forrest testified that she works in Tennessee and, along with another person, medically manages the workers' compensation claims filed against Varco in any of its approximately sixty facilities. Forrest explained that when she receives an email notifying her that an injury has occurred, she contacts the facility to get details of the accident and injury, and any medical treatment provided.

Forrest contacted Green on February 3, 2009. According to an email she sent on that date to Holman, the insurance adjuster, Green explained the accident to her and reported that he was still having trouble controlling his urine. When she asked questions about the name and phone number of Green's doctor, he got upset and wanted to know "what the 50 questions was about." According to the email, when Forrest told Green that she was the nurse case manager who handled Varco's workers' compensation injuries, "he immediately said he is not under work comp." She explained to him that because he was injured at work and seeking medical treatment for his injuries, he did have a workers' compensation case. She relayed that Varco had contacted her to say that he was not reporting to work and it did not have any documentation from a physician restricting him from work. Green replied that he would contact his doctor and have him call her. At that time, she had no doubt but that Green had been injured in an accident at Varco. Nevertheless, she closed Green's file because "he would not give [her] any information." Forrest clarified, however, that no one at Varco decides whether to deny a workers' compensation claim. Instead, that decision is left to the independent adjusters, such as Holman.

8

The deposition of Billy Holman, an insurance adjuster employed by Specialty Risk Services and assigned to handle Green's claim, was submitted as an exhibit by Varco. Therein, Holman explained that he was assigned Green's claim on February 3, 2009, and spoke with him the next day. His file contained a copy of the accident report completed by Varco, a copy of the MedXcel report, and the February 3, 2009 email from Forrest. At that time, he had no doubt in his mind that Green had injured his groin area in an accident at Varco on January 27, 2009.

Although normal protocol was to take a recorded statement from an injured worker, Green would not allow Holman to record their conversation, "stating that he was not pursuing this current medical treatment under his work comp claim." When Holman asked Green what doctor he was treating with and what he was being treated for, Green would not elaborate other than to say he was being treated for something unrelated to his workers' compensation injury and under his own insurance coverage. Holman verbally confirmed with Green that the current medical treatment he was pursuing was not related to his workers' compensation claim and told Green that he would be confirming again by letter. Holman mailed a letter to that effect to Green that day.

Upon questioning from Green's attorney, Holman confirmed that he never received any work release forms regarding Green and that after Green filed his 1008, he gave Green's file to defense counsel.

In making its ruling, the WCJ noted that there was no real argument as to whether an accident involving Green occurred. It further noted that, because there was conflicting opinions from the doctors, it had to decide which side to believe. The

9

WCJ explained his appreciation of the accident and Varco's handling of Green's claims as follows:

> [T]hey were working on this motor and this bolt of a thing, which is about a foot and a half long, with a big head on it, unexpectedly, out of nowhere, because it wasn't supposed to be pressurized, came flying out of this little cannon like affair, hit the man in the groin and they said, knocked him about ten feet. . . .
>
> But, there's something sensitive about this matter. There just is. I know you know that. . . . [I]t's hard to handle. . . .
>
> Now, I think the company's response to this is a tad out - - no, it's not a tad. It's way out of whack, with what Louisiana law requires. . . .
>
> You just can't have somebody that has some good evidence that they get hurt and not turn in necessary paperwork and from that, deduce, or induce, deduce, that nothing happened. The law requires that there be an investigation. Seems to me, most of the investigation here occurred when that adjuster investigated the top of his desk to find out if he could find anything to disprove what the man said. Apparently didn't. . . . I don't have any confidence that [Green] told [Ms. Forrest] that this - - that I want you to be sure, be absolutely sure that none of these people at the insurance company get the idea that I should be on workers' compensation. I just do not believe that's what he said, based on what everybody else said.
>
>         . . . .
>
> . . . Either he's completely malingering, making up all of this information out of thin air or he got hurt. And there's no middle ground here. I think the medical evidence read carefully or even glanced at, or explained any way you want to look at it, shows the man got hurt. It also shows a paucity of concern on behalf of the insurance company. In Louisiana, as you know, arbitrary and capricious behavior can cost you. I think the insurance company here, would almost have to work to get up to the level of arbitrary and capricious. When an employee gets hurt, you almost have to be able to look at them and make some evaluation of what you're going to do as opposed to getting ready to prepare for a defense. And I think that's exactly what happened here.

As a preliminary matter, we agree with the finding implicit in the judgment entered by the WCJ that Green suffered personal injuries as the result of an accident that occurred during the course and scope of his employment with Varco. Moreover,

10

Varco in its brief to this court "does not dispute that [Green] was struck in the groin on January 27, 2009."

*Medical Benefits*

Varco asserts that the WCJ erred in finding that Green proved that his past medical expenses, as well as his need for future medical care, were related to the injury that he suffered at work. Varco further claims that the WCJ erred in not delineating in the judgment which particular medical bills it was being ordered to pay.

Green counters that he presented ample proof that the treatment he received from his family physician, Dr. Metoyer, Dr. White, and Dr. Tassin, as well as his treatment at U.M.C., was related to the groin injury he suffered on January 27, 2009. Thus, Green submits that the judgment which speaks in terms of "all work-related medical expenses incurred" requires that the bills generated by Drs. Metoyer, White, and Tassin, and by U.M.C. are to be paid by Varco. Next, Green disputes Varco's contention that the judgment requires it to pay for future medical bills yet to be incurred. Instead, he posits, the judgment requires Varco to authorize treatment by his choice of physician.

Green treated with Dr. Metoyer's office until April 3, 2009, at which time he could no longer afford to do so. During his treatment, Dr. Metoyer ordered a scrotal ultrasound and recommended that Green consult with a urologist. Green was thereafter treated at U.M.C. until February of 2010. In the interim, Green had office visits with Drs. Tassin and White, respectively.

Varco's arguments rely heavily on the opinion of Dr. Edward Breaux, the urologist it hired to render a second opinion. Dr. Breaux examined Green on September 24, 2009. At that time, Green complained of pain in his left hip and thigh

11

regions, trouble with erections and ejaculation, and urinary leakage/incontinence.[3]

While Dr. Breaux found no objective signs of any urological injury to account for Green's continued complaints of significant pain, he admitted that he did not perform any blood tests to check Green's hormone levels or any advanced tests of the nerve/muscle functioning of Green's bladder. Further, when asked point blank whether Green was forthright in his complaints of pain in response to his physical examination by Dr. Breaux, the doctor admitted that Green:

> appeared to be in a whole lot more discomfort than I could objectively find things wrong, and realizing it was nine months after the accident, so, obviously, he had something going on. It just was hard for me to tell exactly what that was, you know, what was causing his significant complaints of pain.

Although Dr. Breaux found no blood in Green's urine when he looked at it under a microscope, he stated that if Green had blood tests results of "RBC greater than one hundred," as was noted in a U.M.C. record dated November 23, 2009, he would have ordered a cystoscopy[4] in order to discover the cause of the blood.

In ruling that Green was entitled to recover his past medical expenses and to receive care in the future from his choice of physician, the WCJ clearly found Green, his wife, and Beard more credible than Forrest, Bertrand, or Holman with regard to whether Green ever said that he was not seeking any workers' compensation benefits as a result of his January 27, 2009 injury. We find no error in the WCJ's credibility determination. After Green was injured at the workplace, Varco simply turned its back on him despite the fact that he steadily and consistently sought medical

---

[3]During his trial deposition, Dr. Breaux failed to note on direct examination that Green was suffering with urinary leakage/incontinence. Nevertheless, he admitted on cross-examination by Green's attorney that Green did relate those problems to him.

[4]According to Dr. Breaux, a cystoscopy involves using a fiberoptic light to look inside the bladder.

treatment for the injuries he suffered as a result of that injury. Green was fired on February 9, 2009, less than two weeks after his injury, thus limiting his ability to afford adequate medical care. He filed his 1008 just over a month after his injury. Even Varco's doctor admitted that Green was forthright and that he continued to suffer from significant pain in the area where he was injured. The WCJ did not err in finding that Green proved that his past medical expenses, reflected in the bills generated by Drs. Metoyer, White, and Tassin, and by U.M.C., were related to treatment for his January 27, 2009 injury. Likewise, the WCJ did not err in requiring Varco to authorize future treatment of Green by his choice of physician.

*Indemnity Benefits*

Varco contends that the WCJ erred in awarding Green indemnity benefits because he failed to offer medical testimony to establish that he was disabled and/or to relate any such disability to his accident at work. Green counters that he proved by lay and medical testimony that he was unable to work due to his work injury.

In *Odom v. Kinder Nursing Home*, 06-1442, p. 5 (La.App. 3 Cir. 4/25/07), 956 So.2d 128, 132, we directed that:

> "The issue of disability within the framework of the workers' compensation law is a legal rather than a purely medical determination. *LeBlanc* [*v. Grand Isle Shipyard, Inc.,* 95-2452 (La.App. 1 Cir. 6/28/96)], 676 So.2d [1157,] 1161. The issue of disability is determined with reference to the totality of the evidence, including both lay and medical testimony. *LeBlanc,* 676 So.2d at 1161." *Walker v. High Tech Refractory Servs., Inc.,* 03-1621, p. 4 (La.App. 1 Cir. 6/25/04), 885 So.2d 1185, 1188.

Both Green and his wife testified that his injuries have not only persisted since his injury, but that they have worsened, and that he continues to suffer from substantial pain. In addition, the medical records that Green submitted show that he continues to be plagued with symptoms related to his January 27, 2009 work injury.

13

Given the totality of the evidence and testimony, we cannot say that the WCJ erred in making the legal determination that Green is unable to engage in any type of employment. We are convinced that the WCJ did not err in awarding Green indemnity benefits.

*Applicable Indemnity Rate*

Varco contends that the WCJ erred in calculating the appropriate TTD rate. It insists that the rate should be $346.84 per week, instead of the $348.40 per week awarded in the judgment. Green did not address this issue in its appellee brief. We note, however, that in its oral reasons for judgment, the WCJ awarded Green indemnity "set at the appropriate rate." We have reviewed the calculation contained in Varco's appellant brief and agree that it represents the amount that should have been awarded. The judgment will be amended to correct the rate of TTDs owed by Varco to the rate of $346.84 per week.

*Penalties and Attorney Fees*

Varco submits that the WCJ erred in awarding Green any penalties and attorney fees because it "reasonably controverted" Green's claim. Varco claims that it denied Green's claim and closed his compensation file because Green told three people that he was not pursuing his treatment under workers' compensation. As such, Varco claims that its reliance on the information provided by those people was reasonable and its having declined to award Green benefits was "properly controverted." Varco further contends that the WCJ improperly applied the "arbitrary and capricious" standard in determining whether Green was entitled to an award of penalties and attorney fees.

14

In opposition, Green contends that under either the "arbitrary and capricious" or the "reasonably controverted" standard, the WCJ was well within its discretion in awarding him penalties and attorneys fees pursuant to La.R.S. 23:1201(F).

Louisiana Revised Statutes 23:1201 is the relevant statute in determining whether an employer should be assessed penalties and attorney fees for failure to timely pay indemnity or medical benefits. The statute provides that no penalties or attorney fees shall be assessed "if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer . . . had no control. La.R.S. 23:1201(F)(2). Further, "[t]o avoid the imposition of penalties and attorney fees for the nonpayment of benefits, the employer has a continuing obligation to investigate, to assemble, and to assess factual information before denying benefits." *Romero v. Northrop-Grumman*, 01-24, pp. 10-11 (La.App. 3 Cir. 5/30/01), 787 So.2d 1149, 1156, *writ denied*, 01-1937 (La. 10/26/01), 799 So.2d 1144.

> An employer avoids the imposition of penalties and attorney's fees by satisfying its continuing obligation to investigate, assemble, and assess factual information prior to it denying benefits. Furthermore, the decision to award penalties and attorney's fees is factual in nature and will not be reversed on appeal absent manifest error.

*Odom*, 956 So.2d at 141-42 (citations omitted). "The purpose of imposition of penalties and attorney fees is to discourage indifference and undesirable conduct by employers and insurers." *Burns v. Interstate Brands Corp.*, 09-705, p. 7 (La.App. 3 Cir. 2/3/10), 30 So.3d 271, 277.

Green filed his 1008 on March 3, 2009, a mere twenty-nine days after Holman confirmed in a letter dated February 4, 2009, "that [Green was] seeking medical treatment from [his] family Dr. that is unrelated to [his] workers' compensation claim for the above referenced date." The date referenced in the letter was January 27,

15

2009, the date of Green's accident. The filing of Green's claim should have prompted Varco to further investigate Green's claim and to reevaluate its belief that Green was not seeking workers' compensation benefits, despite what he may or may not have indicated prior to that time.

Although the WCJ used the words "arbitrary and capricious," we are not convinced that it applied the wrong standard in determining whether Green was entitled to recover penalties and attorney fees. In *McClain v. Pinecrest Development Center*, 00-1622, p. 4 (La.App. 3 Cir. 2/28/01), 779 So.2d 1112, 1115, n.1, this court stated:

> We recognize that the workers' compensation judge made a finding that Pinecrest's failure to pay the invoices was "arbitrary and capricious" while the standard provided in La.R.S. 23:1201 is the reasonably controverted standard. However, considering that "[u]nreasonably controverting a claim . . . requires action of a less egregious nature than that required for arbitrary and capricious behavior," *Brown v. Texas-La Cartage, Inc.*, 98-1063, p. 8 (La.12/1/98), 721 So.2d 885, 890, we find no error under the facts of this case.

After reviewing the testimony and evidence in this matter, we are similarly convinced that Varco did not "reasonably controvert" Green's claim. Accordingly, the WCJ did not err in awarding penalties and attorney fees to Green.

*Green's Answer to Appeal*

Green answered Varco's appeal seeking additional attorney fees for work done on appeal and an order that Varco be cast with legal interest and all costs incurred in the trial and appellate court.

In *Nash v. Aecom Technology Corp.*, 07-990, p. 8 (La.App. 3 Cir. 2/6/08), 976 So.2d 263, 268, this court held that "[a] workers' compensation claimant is entitled to an increase in attorney fees to reflect additional time incurred in defending an

16

employer/insurer's unsuccessful appeal." Green is awarded an additional attorney fee of $2,000.00 for the work done on appeal.

The WCJ cast Varco with all costs. An appellate court reviews a WCJ's assessment of court costs under an abuse of discretion standard. *Lambert v. Brookshire Grocery Co.*, 06-1001 (La.App. 3 Cir. 12/20/06), 945 So.2d 918. Given that Green prevailed on all of his claims before the WCJ, we find no error in costs having been assessed against Varco. Moreover, because Green was successful in defending the judgment in his favor, Varco is cast with all costs of this appeal. *See* La.Code Civ.P. art. 1920.

### DECREE

The judgment rendered by the workers' compensation judge in favor of Christopher Green and against National Oilwell Varco is amended to provide that the rate of TTDs owed by Varco is $346.84 per week. The judgment is affirmed in all other respects. Green is awarded additional attorney fees of $2,000.00 for work performed on this appeal. All costs of this appeal are assessed against National Oilwell Varco.

**AMENDED IN PART AND AFFIRMED. ADDITIONAL ATTORNEY FEES AWARDED TO APPELLEE.**