# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-166

**RHONDA TIMBERLAKE**

**VERSUS**

**CHRISTUS HEALTH CENTRAL LOUISIANA D/B/A
FARA INSURANCE COMPANIES**

\*\*\*\*\*\*\*\*\*\*

### APPEAL FROM THE
### OFFICE OF WORKERS' COMPENSATION, DISTRICT 02
### PARISH OF RAPIDES, DOCKET NO. 10-7681
### HONORABLE JAMES L. BRADDOCK, PRESIDING
\*\*\*\*\*\*\*\*\*\*

### SYLVIA R. COOKS
### JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy, and Phyllis M. Keaty, Judges.

**AFFIRMED AS AMENDED.**

Maria A. Losavio
Losavio Law Office, LLC
1821 MacArthur Drive
P.O. Box 12420
Alexandria, LA  71315-2420
(318) 767-9033
**ATTORNEY FOR PLAINTIFF/APPELLANT**
    Rhonda Timberlake

John C. Turnage
Meyer, Smith & Roberts, LLP
1550 Creswell
Shreveport, LA  71101
(318) 222-2135
**ATTORNEY FOR DEFENDANTS/APPELLEES**
    Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital

**COOKS, Judge.**

Both the employer and worker assert various errors in the judgment rendered by the Office of Workers' Compensation following a work accident involving the Claimant.

## FACTS AND PROCEDURAL HISTORY

On March 30, 2010, the Claimant, Rhonda Timberlake, alleged she sustained a left wrist and forearm injury while in the course and scope of her employment as a registered nurse with Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital (hereafter Cabrini). The alleged injury occurred when Claimant was repositioning an Intensive Care Unit (ICU) patient. A claim for workers' compensation benefits was eventually filed. Cabrini is self-insured for purposes of this claim. F.A. Richard and Associates, Inc., (FARA) is the third-party administrator of Cabrini's workers' compensation claims.

After the injury, Claimant, upon referral by Cabrini, received care from Dr. Gordon Webb, an occupational medicine specialist. Restrictions were placed on Claimant, but she continued her employment with Cabrini. Claimant then chose Dr. William Crenshaw, an orthopedist, as her choice of physician. She was seen by Dr. Crenshaw on several occasions. During the course of her treatment with Dr. Crenshaw, Claimant underwent an MRI, EMG and nerve conduction studies. She had her arm placed in a cast and was advised to begin physical therapy. She was restricted from working on May of 2010 and began receiving temporary total disability (TTD) benefits until she returned back to work with other restrictions on June 15, 2010.

Dr. Crenshaw suggested that Claimant be evaluated by his partner, Dr. Mark Dodson, also an orthopedic specialist. Claimant agreed, and Dr. Dodson examined her on June 16, 2010. On the day following the examination by Dr. Dodson, Claimant called the adjuster for FARA, Joanna Cannatella, and requested to be

2

evaluated by another orthopedic hand specialist, Dr. Richard Morrow. Ms. Cannatella denied this, believing the change to Dr. Dodson was a prior change of orthopedic specialists. Claimant remained under Dr. Dodson's care until she was granted the right to be treated by Dr. Richard Morrow.

According to Claimant, when she returned to work, Cabrini had to find things for her to do under her work limitations. She was moved around to various areas, many involving monitoring and administrative duties. Claimant earned approximately $26.00 per hour. It was subsequently alleged by Cabrini that Claimant missed periods of work due to unrelated illnesses or family events. Claimant disputed that, and claimed she missed work only for problems related to her arm injury.

In October of 2010, Claimant was released to return to her nursing duties in the ICU Unit. Claimant left her employment at Cabrini in November of 2010 because, according to her, she was not making near the money she was making prior to her injury. She stated this was largely due to Cabrini failing to offer Claimant sufficient shifts that would earn her close to her pre-accident wages. She also testified there were rising tensions in the ICU because she was still working there with restrictions and her co-workers were forced to compensate for her medical limitations.

In an effort to earn more money, Claimant accepted contract nursing jobs in California. Claimant stated this job also appealed to her because she was able to work with more ambulatory patients rather than bedbound ICU patients. She testified she earned $30.00 an hour during this employment. It was maintained this level of remuneration still did not reach 90% of her pre-accident wages.

Following the denial by Ms. Cannatella on June 17, 2010 of her request to be seen by Dr. Morrow, Claimant retained legal counsel. Several requests were made by Claimant to Cabrini to get pre-authorization to see Dr. Morrow, which

were all denied. Dr. Morrow's policy required written pre-authorization from the employer for an initial evaluation of Claimant since she was a workers' compensation patient. No pre-authorization was given.

Counsel for Claimant filed a Motion for Authorization of Treatment with Dr. Morrow. On March 10, 2011, a hearing on that motion was held before the Office of Workers' Compensation (OWC). The Workers' Compensation Judge (WCJ) ruled in favor of Claimant and ordered Cabrini to allow Claimant to obtain medical treatment with Dr. Morrow. The issue of whether a penalty and attorney fees were warranted for Cabrini's failure to timely authorize this change was deferred to the trial on the merits.

Claimant began treatment with Dr. Morrow in March of 2011. During this time, claimant was working periodically in California. On September 15, 2011, Dr. Morrow, concerned with Claimant's lack of improvement, scheduled several diagnostic tests, an arthrogram, an Electromyography (EMG) and a nerve conduction study (NCS). After discussing the results with Claimant, Dr. Morrow recommended surgery on her wrist and took her completely off of work. Cabrini did not begin paying TTD benefits to Claimant until November 13, 2011, the date of the wrist surgery.

Trial on the merits was held on March 28, 2012, focusing primarily on indemnity, penalties and attorney fees allegedly owed. Average weekly wages were stipulated to be $1,549.83, which resulted in a maximum temporary total disability (TTD) rate of $577.00 per week. Claimant alleged for the months of July, August and September 2010, she returned to work at Cabrini under restrictions and was unable to earn at least 90% of her pre-accident wages. Claimant also requests supplemental earnings benefits (SEB) from December 2010 through September 2011 when she was "forced' to leave Cabrini to work out of

4

state resulting in less than 90% of her pre-accident wages. Claimant also requested penalties and attorney fees for Cabrini's unreasonable failure to pay SEB.

Claimant also maintained she was entitled to TTD benefits from September 27, 2011 to November 13, 2011 (the date she began receiving TTD benefits). Claimant maintained Dr. Morrow removed her from work on September 27, 2011 and recommended surgery. Penalties and attorney fees were also requested for Cabrini's non-payment of TTD benefits during that time period.

The WCJ issued an oral ruling on May 21, 2012, finding Claimant "sustained a work accident on March 30, 2010 during the course and scope of her employment" with Cabrini. The WCJ further concluded Claimant was entitled to SEB benefits for July, 2010 in the amount of $1,569.70; for August, 2010 in the amount of $777.82; for September, 2010 in the amount of $1,155.77. The WCJ found these were the only months Claimant was entitled to SEB. The WCJ also assessed Cabrini with a $2,000.00 penalty for what the court termed "an unreasonable failure to pay SEB benefits to [Claimant] for July, August and September of 2010." The WCJ awarded TTD benefits to Claimant from September 27, 2011 through November 13, 2011, and continuing. The WCJ found Cabrini "was unreasonable in its failure to pay TTD" during the above period and was assessed a $2,000.00 penalty. The WCJ denied Claimant's request for a penalty and attorney fees for Cabrini's refusal to allow her to change orthopedic surgeon from Dr. Crenshaw and/or Dr. Dodson to Dr. Morrow. Lastly, the WCJ awarded attorney fees to Claimant in the amount of $7,500.00.

Claimant filed a Motion for New Trial on the WCJ's denial of penalties and attorney fees for Cabrini's failure to timely authorize the change of physician to Dr. Morrow. The basis for the motion was that the WCJ referenced a statute that had been repealed. At a hearing on the motion, the WCJ acknowledged the citing

5

of an inappropriate statute, but affirmed his previous ruling denying penalties and attorney fees.

Cabrini appealed the WCJ's judgment, asserting the following assignments of error:

> 1. The WCJ erred in awarding SEB to Claimant for July, August and September, 2010.
>
> 2. The WCJ erred in awarding TTD benefits from September 27, 2011 through November 13, 2011.
>
> 3. The WCJ erred in finding Cabrini was arbitrary and capricious and awarding penalties and attorney fees.

Claimant filed an answer to Cabrini's appeal, and asserts the following assignments of error:

> 1. The WCJ erred in not awarding penalties and attorney fees for Cabrini's failure to timely authorize the change in treating physician to Dr. Morrow.
>
> 2. The WCJ erred in failing to award SEB for the periods Claimant was working out of state under restrictions from work.
>
> 3. The WCJ erred in not awarding penalties and attorney fees for Cabrini's failure to pay SEB for the periods Claimant was working out of state.
>
> 4. An increase in attorney fees is warranted for the efforts put forth prior to appeal and additional attorney fees are warranted for the work necessitated by the appeal.

## ANALYSIS

"Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Foster v. Rabalais Masonry, Inc.*, 01-1394, p. 2 (La.App. 3 Cir. 3/6/02), 811 So.2d 1160, 1162, *writ denied*, 02-1164 (La.6/14/02), 818 So.2d 784 (citation omitted).

6

In *Green v. National Oilwell Varco*, 10-1041, pp. 3-4 (La.App. 3 Cir. 4/27/11), 63 So.3d 354, 358, we explained:

> "The determination of coverage is a subjective one in that each case must be decided from all of its particular facts." *Jackson v. Am. Ins. Co.*, 404 So.2d 218, 220 (La.1981). This court has held that, in light of that standard of review, "great deference is accorded to the [workers' compensation judge's] factual findings and reasonable evaluations of credibility." *Cent. Lumber Co. v. Duhon*, 03-620, p. 3 (La.App. 3 Cir. 11/12/03), 860 So.2d 591, 593, *writ denied*, 04-315 (La.4/2/04), 869 So.2d 880 (quoting *Garner v. Sheats & Frazier*, 95-39, p. 7 (La.App. 3 Cir. 7/5/95), 663 So.2d 57, 61).

## CABRINI'S APPEAL

### I. *SEB for July, August, September 2010* .

Cabrini argues the WCJ erred in awarding SEB to Claimant for July, August and September of 2010. In *Allen v. City of Shreveport*, 618 So.2d 386, 388 (La. 1993) (footnote omitted), the Louisiana Supreme Court summarized the purpose of SEB as follows:

> Supplemental earnings benefits were established in 1983 as a method of replacement of lost wages for partially disabled employees. The benefits are designed to replace lost earning capacity of workers who do not fall under the definition of total disability. When an injured employee is able to engage in a gainful occupation, but because of his work-related disability is unable to earn wages at the level he was earning prior to his injury, he is classified as partially disabled. And when the partial disability reaches the level that the employee is unable to earn wages equal to ninety percent or more of the wages he was earning at the time of the injury, he is entitled to supplemental earnings benefits, calculated according to a formula relating to his pre-injury wages and the wages he "is able to earn" in any employment or self-employment after the injury. La.Rev.Stat. 23:1221(3)(a).

The employee bears the initial burden of proving by a preponderance of the evidence that he or she is disabled due to a work-related injury that rendered him or her unable to earn ninety percent of the pre-injury wages. *Banks v. Ind. Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. "In determining if an injured employee has made out a prima facie case of entitlement to supplemental earnings benefits, the trial court may and should take into account all

7

those factors which might bear on an employee's ability to earn a wage." *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1007 (La. 1989), *quoting Gaspard v. St. Paul Fire & Marine Ins. Co.*, 488 So.2d 1037 (La.App. 3 Cir. 1985); *see also* La.R.S. 23:1221(3)(a). Once the employee seeking SEB establishes a prima facie case, the burden shifts to the employer to show the employee is physically capable of work and that the work was offered or available in the employee's or employer's community or reasonable geographic region. La.R.S. 23:1221(3)(c)(i).

The evidence established that Claimant had restrictions placed upon her immediately after the injury occurred, although she continued working in more sedentary duties. The WCJ found, even with her physical limitations, Claimant was able to earn at least 90% of her pre-accident wages during April, 2010, thus no SEB was due for that month. In May of 2010, she was removed from work, and began receiving TTD benefits. The WCJ found no SEB was due for May and June, which is not disputed by the parties.

Claimant returned to work with restrictions by July, 2010. Claimant testified she attempted "as best she could" to schedule as many hours as possible, but was unable to earn 90% of her pre-accident wages. Cabrini argues Claimant was not prevented from earning 90% of her pre-accident wages during the period in question, but rather refused shifts offered to her by Cabrini that fell within her restrictions. Cabrini asserts she turned down these offered shifts for "unrelated personal reasons." Cabrini specifically point to certain instances where Claimant asked not to be scheduled on some Fridays to attend her son's band performance. Claimant maintained any time she missed was due to continued pain with her injured arm, and that she notified Cabrini well in advance if she could not work on a certain Friday.

The WCJ specifically noted he found Claimant's testimony that she attempted to secure as many shifts as possible credible. Stephen Dubae, Cabrini's

ICU Supervisor, testified he was largely unaware of what hours and shifts were offered to Claimant. The WCJ noted Claimant's testimony "seemed to be corroborated" by Mr. Dubae. After a review of the record we find no error in the WCJ's finding that Claimant established her entitlement to SEB for July, August and September of 2010.

We also find unpersuasive Cabrini's argument that the lack of available shifts for Claimant was due to an alleged reduction in the number of patients in the facility. The law clearly sets forth that once the "employee seeking SEB establishes a prima facie, the burden shifts to the employer to show the employee is physically capable of work and *that the work was offered or available* in the employee's or employer's community or reasonable geographic region. La.R.S. 23:1221(3)(c)(i). Cabrini failed to meet their burden at trial to establish that sufficient work was offered or available to allow Claimant to earn 90% of her pre-accident wages.

Cabrini also argues the WCJ erred in awarding penalties and attorney fees for its refusal to pay SEB for July, August and September of 2010. The determination of whether an employer should be cast with penalties and attorney fees is essentially a question of fact, and the WCJ's finding must not be disturbed on appeal absent manifest error. *Wiltz v. Baudin's Sausage Kitchen*, 99-930 (La.App. 3 Cir. 6/19/00), 763 So.2d 111, *writ denied*, 00-2172 (La. 10/13/00), 771 So.2d 650. "To avoid penalties and attorneys fees for the nonpayment of benefits, the employer or insurer is under a continuing duty to investigate, to assemble, and to assess factual information before denying benefits." *George v. Guillory*, 00-591, p. 13 (La.App. 3 Cir. 11/2/00), 776 So.2d 1200, 1209, *overruled on other grounds by Smith v. Quarles Drilling Co.*, 04-179 (La. 10/29/04), 885 So.2d 562.

We note Cabrini puts forth the same arguments for its belief that it should not be cast with penalties and attorney fees as it did in its assignment of error that

9

SEB was not warranted at all, i.e., Claimant's inability to earn 90% of her pre-accident wages was due to her refusal of shifts for personal reasons and a shortage of patients at the hospital. These arguments were found lacking above and are similarly no defense to the WCJ's imposition of penalties and attorney fees for Cabrini's failure to pay SEB for the pertinent period.

## II. TTD Benefits.

The WCJ awarded Claimant TTD benefits from September 27, 2011, the date Dr. Morrow recommended surgery, through November 13, 2011, the day before surgery was performed. Cabrini has justified its refusal to pay TTD benefits during this period on the fact that Karl Bilderback (an orthopedic surgeon selected by Cabrini to examine Claimant in light of Dr. Morrow's surgery recommendation) determined Claimant was capable of working, albeit with restrictions, during the period in question. The WCJ examined in detail Dr. Bilderback's conclusions concerning Claimant, but determined she was still entitled to TTD benefits for the period in question.

Following Dr. Morrow's surgical recommendation, Cabrini requested that Claimant be examined by Dr. Bilderback. On October 28, 2011, Dr. Bilderback examined Claimant and concluded she had "clearly not reached Maximum Medical Improvement, as she is in need of further treatment." The WCJ noted that Dr. Bilderback did state he believed Claimant could return to work with restrictions. Specifically, Dr. Bilderback wrote:

> I believe she could return to work at this point. However, she would have difficulty in lifting patients with draw sheets, as well as any fine motor activity with her left hand. These type of activities would be required in her job description. I believe she would have difficulty returning to work without some restrictions or accommodations.

Despite his belief that Claimant could only return to work while under restrictions, the WCJ noted neither Dr. Bilderback nor Cabrini presented any updated restrictions or accommodations after the arthrogram, EMG and NCS performed in

10

September of 2011. The WCJ gave the following oral reasons for finding TTD benefits should have been commenced during the period in question:

> Pursuant to the [cases of *Ebare v. Cubic Applications, Inc.*, 08-1095 (La.App. 3 Cir. 3/4/09), 5 So.3d 1028 and *Pickett v. Stine Lumber Co.*, 93-1534 (La.App. 3 Cir. 6/1/94), 640 So.2d 769], toward the facts and the particular circumstances of [Claimant's] case, she is in further need of further medical care, testing and treatment. Even Dr. Bilderback indicates she may need further nerve conduction – I mean, EMG studies, updated studies, and this was what Dr. Dodson had indicated in July 5th of 2010. Indicates she is not at Maximum Medical Improvement and needs to have the surgery. She's going to have difficulty lifting patients. She has a problem with fine motor activity with her hand, and particularly, since it hasn't been shown by the employer since this new development of medical information from Dr. Morrow, as well as Dr. Bilderback with – that there's any employment –[in Claimant's], or the employer's reasonable geographic area [that] meets this new criteria, [Claimant] is, in fact, entitled to TTD benefits September 27th of 2011 until she had her surgery, which I think [was on] November 14th of 2011.

We cannot say the WCJ manifestly erred in its award of TTD benefits for the period in question. This Court has held when a claimant, either at the time of trial or at the time of nonpayment of benefits, is still undergoing testing and treatment with an "indefinite recovery period, she is entitled to recover TTD's. *See Warren v. Maddox Hauling*, 02-733 (La.App. 3 Cir. 12/4/02), 832 So.2d 1082, *writ denied*, 03-4 (La. 4/21/03), 841 So.2d 791; *Foster v. Liberty Rice Mill*, 96-438 (La.App. 3 Cir. 12/11/96), 690 So.2d 792.

We likewise affirm the WCJ's imposition of penalties and attorney fees for Cabrini's failure to pay TTD benefits from September 27, 2011 through November 14, 2011. The WCJ did not manifestly err in finding Cabrini did not perform its continuing duty to investigate, assemble and assess the factual information before denying TTD benefits for the period in question.

## CLAIMANT'S APPEAL

### I. *Penalties and Attorney Fees for Failure to Authorize Change of Physician.*

A review of the record indicates Claimant initially sought treatment the day of the accident at Cabrini Hospital. She then began treatment with Dr. William

Crenshaw of Mid-State Orthopedic and Sports Medicine, who treated her over several visits, including ordering physical therapy and several diagnostic tests.

Dr. Crenshaw suggested to Claimant that she be evaluated by his partner, Dr. Mark Dodson. Claimant agreed, and Dr. Dodson examined her on June 16, 2010. According to Claimant, she did not agree to select Dr. Dodson as her choice of orthopedist, and only thought he was giving a second opinion to his partner, Dr. Crenshaw. However, she was told by Mid-State that once Dr. Dodson had seen her, according to policy she was unable to return to Dr. Crenshaw for treatment.

On the day following the June 16, 2010 examination by Dr. Dodson, Claimant called the adjuster for FARA, Joanna Cannatella, and requested to be evaluated by another orthopedic hand specialist, Dr. Morrow. Ms. Cannatella denied this, believing the change to Dr. Dodson was a prior change of orthopedic specialists. The WCJ noted that, even after voicing her disapproval, Claimant continued seeing Dr. Dodson.

Claimant notes that Dr. Dodson believed that an evaluation by Dr. Morrow was an "excellent idea," and that Cabrini was aware of Dr. Dodson's opinion. However, no authorization was given. Thus, they contend it was arbitrary and capricious to deny Claimant's request to see Dr. Morrow.

Counsel for Claimant filed a Motion for Authorization of Treatment with Dr. Morrow. On March 10, 2011, a hearing on that motion was held before the OWC. The WCJ ruled in favor of Claimant and ordered Cabrini to allow Claimant to obtain medical treatment with Dr. Morrow. The issue of whether a penalty and attorney fees were warranted for Cabrini's failure to timely authorize this change was deferred to the trial on the merits. At the trial on the merits, the WCJ declined to assess penalties and attorney fees.

12

Louisiana Revised Statutes 23:1121(B)(1)[1] provides:

> The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S.23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.

Claimant contends she never selected Dr. Dodson as her treating physician, but merely consented to a second opinion from him at Dr. Crenshaw's request. Cabrini disputes this, arguing Claimant "is a registered nurse and she was aware Dr. Crenshaw wanted her to see the hand specialist within his clinic." Her agreement to see him, Cabrini argues, "became her choice."

The WCJ's decision to award penalties and attorney's fees is a question of fact which is reviewed under the manifest error standard of review. *Pauley v. Wal-Mart Stores, Inc.*, 02-1354 (La.App. 3 Cir. 6/4/03), 847 So.2d 757, *writ denied*, 03-1884 (La.11/21/03), 860 So.2d 544. In the instant matter, the WCJ concluded whether to grant Claimant's request for a change in physician was "a genuine issue, reasonably contested by the employer, given the factual issues about the actual choice of that physician." Thus, the WCJ declined to award penalties and attorney fees. The law is clear that "an employer should not be penalized for bringing a close legal issue to court." *Burruss v. Centro Mgmt., Inc.*, 00-1274, p. 2 (La.App. 3 Cir. 2/28/01), 780 So.2d 630, 631. Mindful of the vast discretion vested in the trier of fact, we cannot say the WCJ erred in finding there was sufficient evidence for Cabrini to contest Claiman's choice of physician request. Accordingly, we affirm the WCJ's denial of penalties and attorney's fees on this issue.

## II. Claimant's Request for SEB While Working Out of State.

---

[1] La.R.S. 21:1121(B) was amended by 2013 Acts 337, § 1, effective August 1, 2013. The amendments are retroactive, and address the hearing on the claimant's choice of physician.

13

The WCJ noted that Claimant earned in excess of her pre-accident wages in October of 2010, when she was released to return to the ICU Unit. In the middle of November, Claimant resigned from her employment with Cabrini and began accepting contract nursing jobs in California. Claimant worked in California from December 2010 until September 27, 2011, when Dr. Morrow removed her from all work.

Claimant maintained she left her employment with Cabrini because she was not making near the money she was making prior to her injury and there were rising tensions in the ICU Unit due to her fellow employees having to compensate for her medical restrictions. Despite her pursuing and accepting work in California, Claimant maintained she was still unable to earn 90% of her pre-accident wages, and the WCJ erred in not awarding her SEB for this period.

The WCJ gave the following reasons for denying SEB to Claimant during her period of out-of-state employment:

> Based on the time that she had worked during the month of November of 2010, she was well on her way, [to] earning greater than 90% of her pre-injury wages for the month of November of 2010. I do not accept [Claimant's] testimony that she left Christus St. Frances Cabrini Hospital because she was making less money after her injury than she was making prior to her injury, since, clearly, up until October or November, after she had been released to return to the ICU Unit, does – as fact, working in the ICU Unit, it – was no medical evidence indicating that she was incapable of doing the work in the ICU Unit. [Stephen Dubae] testified that nothing in the ICU Unit, other than turning patients, required them to lift greater than 41 pounds, that they always had assistance in lifting patients. And the mere fact that someone feels tension in the air from coworkers and having to assist them is not a basis to leave an employment and place the employer in the responsibility of providing SEB benefits when there's no medical corroboration that the worker cannot perform the work. I could find no jurisprudence along that line that I was cited on behalf of [Claimant]. So, [she] is not entitled to SEB from October [2010], all the way through September 27, 2011.

We find the record supports the WCJ's reasoning that Claimant did not leave her employment with Cabrini because she was unable to earn close to her pre-accident wages. Claimant earned well in excess of her monthly pre-accident wages

14

in October of 2010. The WCJ also noted she was on a similar track in November of 2010, until she voluntarily left her employment with Cabrini. Thus, the WCJ's refusal to accept Claimant's contention that she left her employment because she could not earn her pre-accident wages was reasonable. Likewise, we find the WCJ's conclusion that Claimant was able, with occasional assistance, to perform her duties in the ICU was supported by the record.

As for Claimant's argument that there was tension in the ICU that led to her departure, Claimant acknowledged she never went to her supervisor, Mr. Dubae, to voice any concerns over any tension. The WCJ concluded simply because there may be tension with coworkers is not enough by itself to make the employer responsible for payment of SEB, when the record establishes Claimant was able to perform her duties and was able to earn 90% of her pre-accident wages. We find no error in this conclusion.

**III. Increase in Attorney Fees for Work Performed on Appeal.**

We have long held that a claimant who successfully defends the WCJ's ruling should be entitled to additional fees for the work necessitated by the appeal. *Phillips v. Diocese of Lafayette*, 03-1241 (La.App. 3 Cir. 3/24/04), 869 So.2d 313. We will award Claimant additional attorney fees in the amount of $3,000.00.

**DECREE**

For the foregoing reasons, the judgment of the Office of Worker's Compensation is affirmed. The judgment is amended to award Claimant $3,000.00 in additional attorney fees for the work necessitated by Cabrini's appeal. Costs of this appeal are assessed to defendant, Christus St. Frances Cabrini Hospital.

**AFFIRMED AS AMENDED.**